## GRAHAM *v.* GRAHAM
[No. 123, October Term, 1947.]

436

*D∂cided May 19, 1948.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

*Harry E. Goertz* and *Joseph Loeffler,* with whom was *Bernard J. Medairy* on the brief, for the appellant.

*Kenneth C. Proctor* for the appellee.

GRASON, J., delivered the opinion of the court.

On April 2, 1946, the chancellor (Judge Murray) granted a divorce *a vinculo matrimonii,* on the grounds of abandonment and desertion, to Jack Hampton Graham

(appellee) from his wife, Alice Graham (appellant). The wife was proceeded against as a nonresident, and, as she failed to appear as directed by the order of publication passed in the case, a decree *pro confesso* was taken against her and the papers referred to an examiner to take testimony. Two witnesses testified before the examiner, one, the appellee, and the other, Lelia Belle Graham, the mother of the appellee. The solicitor for appellee made a statement to the examiner, in which he stated that on January 10, 1946, he mailed a copy of the bill of complaint in the case to the appellant at 20 Park Terrace Drive, Binghampton, New York, the address of the mother of appellant, and the appellant's last known address.

After the decree for divorce was signed, the case was heard by Judge Gontrum.

On December 2, 1946, the appellant filed a petition in which she prayed the chancellor to strike out the decree. The chancellor sustained a demurrer to this petition. On February 3, 1947, the appellant filed a first amended petition, under oath, in which she prayed the chancellor to pass an order annulling and setting aside: (1) The enrollment of the decree; (2) the decree; (3) the decree *pro confesso;* and (4) to reopen the case and permit the appellant to answer the bill of complaint and be heard in the premises. In her first amended petition the appellant averred that she did not abandon and desert appellee; that on the 16th day of April, 1944, she was driven by her husband and his mother, Lelia Belle Graham, from their home; that thereafter appellee visited her at various places and had marital relations with her until the latter part of December, 1944; that during this time appellee promised to establish a home for her and their baby. On January 12, 1946, she received a letter from Kenneth C. Proctor, solicitor for appellee, which stated: "I have this date filed on behalf of your husband a bill for absolute divorce on the ground of desertion. Within a few days you will receive from

the Clerk of the Circuit Court of Baltimore County a copy of the Order of Publication which has been issued in this case. You will note from a reading of said Order and of the Bill of Complaint that Mr. Graham does not propose to make any claim for the care and custody of your son, James Lewis Graham"; that this letter was referred to Ralph L. Emmons, United States District Attorney at Binghamton, New York, who advised her to do nothing until she received the papers referred to in Mr. Proctor's letter; that "Petitioner (appellant) only recently learned that a decree of divorce had been granted and that she never received a copy of the Bill of Complaint or the Order of Publication" referred to in Mr. Proctor's letter to her; that the decree does not provide for alimony for appellant nor for the custody of their infant son, nor does it provide for his support and maintenance; that the decree was obtained by deliberate fraud, perjury, deceit and imposition perpetrated and practiced upon the court and your petitioner (appellant) and her infant son; that the "case was not heard upon its merits and that your Petitioner has a good and meritorious defense if only given an opportunity to be heard".

The appellee answered this petition, testimony was taken in open court, counsel heard, an opinion of the chancellor filed, and on May 26, 1947, the chancellor ordered: "that the First Amended Petition of Alice Graham be and it hereby is dismissed; and it is FURTHER ORDERED that the said Alice Graham pay the costs of this proceeding". From this decretal order the case comes here on appeal.

Upon the hearing of appellant's petition she was cross examined at length concerning her conduct while she lived with her husband at the home of his parents at Middle River, Baltimore County, Maryland, and before and after that short period. This cross examination was chiefly based upon the testimony of the husband and his mother which was taken before the examiner. In considering the case, therefore, we will consider not only the

testimony taken before the chancellor on appellant's petition, but also the testimony taken before the examiner.

Stated in narrative form, the facts of this case are as follows: At the time appellant came to Baltimore she was twenty-one years old. Prior thereto she lived with her mother at 20 Park Terrace Place, Binghamton, New York. When she came to Baltimore she obtained employment with the Glenn L. Martin Company, at Middle River, Baltimore County. There she met the appellee, who also worked at that plant. They became friends and on the 4th day of May, 1943, Mrs. Helen Dunham, appellee's mother, discovered her daughter was pregnant. The following day Mrs. Dunham came to Baltimore, saw appellee, and he admitted to her that he was responsible for her daughter's condition. On July 2, 1943, these parties were married in New York City. The uncontradicted testimony is that the appellee had previously refused to marry the appellant. After the marriage the appellant went to her mother's home in Binghamton and the appellee returned to Middle River. On July 5, 1943, in a hospital in Binghamton, New York, a son was born to these parties. Ten days thereafter the appellant returned to the home of her mother, in that city, and remained there until January, 1944. During that period her husband visited her at her mother's home, at 20 Park Terrace Place, and in the fall of 1943 he wrote her several letters, which were addressed to her at 20 Park Terrace Place, Binghamton, New York. In January, 1944, the husband and his mother invited the wife to bring the baby to the home of the husband's parents, at Middle River, Baltimore County, Maryland, to live with her husband. She said that this arrangement was to be temporary, as her husband promised her that he would get a house of their own as soon as he could. The husband testified before the examiner: "After we were married she went back to New York with her people and the baby was born there. She stayed with her people until the following January, 1944. In the meantime I had gone up

once to see her. In January, 1944, I asked her to come back to live with me in Middle River, which she did, but she only lived with me until April.

"Q. Was your child with you at that time? A. He was. In that short time we lived together she was continuously complaining and said she only married me to give the baby a name; that she didn't like it here, didn't really love me, and that she was going back to New York."

"Q. From what locality did you last hear from your wife? A. 20 Park Terrace Drive, Binghamton, New York." He testified that he had not lived or cohabited with his wife since she abandoned him in April, 1944, and she told him "she was not going to live with me. When she left she said she was through with me and I know there is no chance of our becoming reconciled."

Lelia Belle Graham, the mother of the appellee, testified before the examiner that she did not know the appellant "until my son brought her to our home in January of 1944". She testified: "He (appellee) was kind and affectionate to her (appellant). He paid her board and gave her ten dollars a week spending money". She testified that the appellant was very indifferent to her husband and was always finding fault and complaining for no reason at all. "Q. You say that Mrs. Graham lived with her husband at your home until April of 1944. What happened at that time? A. She said that she was going back to her people in New York; that she only married her husband to give the baby a name and it was only a marriage of convenience; that she didn't like it here and didn't intend to stay. She said in my presence that she not only didn't love him but didn't even respect him. Q. Where is Mrs. Graham living at the present time? A. The last I heard about her she was with her Mother in Binghamton, New York."

This was the testimony before the examiner, upon which the chancellor granted the decree.

The testimony of the appellant and her mother before the chancellor is, in substance, as follows: The appellant

testified that from the time she arrived at the Middle River home it was apparent that she was not wanted. Her mother-in-law was cold and distant to her, rarely speaking to her, did not introduce her to people who came to the house, and when she, in her embarrassment, left the room she could hear her mother-in-law whispering to the guests. She offered to help her mother-in-law with the household duties, but was not permitted to do so. She saw very little of her husband, as he did not come home until ten o'clock at night. She went nowhere. She endured this treatment for awhile and then complained to her husband. She wanted him to establish a home for her and their child elsewhere, which her husband promised her he would do, but never did. She stated that her mother-in-law told her that she and her husband and her son (appellee) were going to move back to West Virginia in April, and that she would have to leave. The mother-in-law scanned the newspapers for a place for appellant to go. She found a place and told her to move. She was practically put out of the house by her husband and his mother. After she left the Middle River home her husband came to see her and promised her that he would get a place and come to live with her and their child. In September, 1944, she returned, with her baby, to the home of her mother, in Binghamton, New York, and remained there until December, 1944, when she returned to Baltimore. She left her baby with her mother. She again returned to Binghamton in December, 1944, and stayed there until August, 1945, and then came back to Baltimore. She remained in Baltimore from August, 1945, for a year and five months, or until January, 1947. She said she returned to Baltimore because she could get lighter work here. She testified, in answer to the chancellor, that she had an apartment upstairs in the house of Sam Kornberg, at 2701 Alameda Avenue, on the 10th day of January, 1946; that she moved there around Thanksgiving and that she lived there until January, 1947. She afterward testified that

this was in error, that she was living at 1700 Montpelier Street when the bill of complaint was filed. Prior thereto she lived at 1700 Montpelier Street, Baltimore City, and her landlady was Mrs. Gertrude Graham, and that she lived there for almost a year. She stated that she was living at 1700 Montpelier Street at the time the bill for divorce was filed. She further stated that on January 10, 1946, she was living in Baltimore and had lived there continuously since August, 1945, and that she at that time intended to make Baltimore her permanent home, and did live in Baltimore City until January, 1947. She stated that she started to work for the Maryland State Unemployment Compensation Board, as senior clerk, on August 20, 1945, and worked for that Commission until November, 1946, and that her hours were from about eight until four. After her day's work at this position, she worked for Sears, Roebuck and Company from five until ten P.M. She continued to work at Sears, Roebuck and Company until January, 1947.

In December, 1944, the appellee telephoned his mother-in-law, Mrs. Dunham, at Binghamton, and said that he wanted to see his wife, and she told him where she was. Mrs. Dunham learned of the separation in June, 1944. In February, 1945, she went to Middle River to see the Grahams. She stated that the mother of the appellee told her "that they should never have been married in the beginning and she said you know that they should never have been married, and I told her he should never have married her, that they should never have been married for the baby or anyone else, and I told her so in the beginning." "I asked Mrs. Graham why she put Alice and the baby out and she said she could not stand Jack's drinking and after the father came I asked him what had happened after Alice and the baby came home, had it caused him to drink, and he said absolutely no, and I said What was the trouble while she was there, and he said Well, it was his way of showing he didn't like having her there the way things were going and the mother

said, I could not stand his drinking and that was the reason Alice had to go and when she came home crying, he was upset and his mother had said she had put Alice out because she could not stand Jack's drinking."

From April, 1944, until about January 1, 1946, the defendant contributed nothing to the support of either his wife or child. In December, 1945, the appellant went to Binghamton. While she was there her mother came to Baltimore County and instituted a criminal proceeding against the appellant for nonsupport of his infant child, as the result of which he was required to pay $8.00 per week to his mother-in-law for the support of his child. Mr. Wickes, the Probation Officer of the court, took the name and address of Mrs. Dunham. While he was getting this data, in the courtroom, Mr. Proctor inquired of Mrs. Dunham the address of the appellant in Baltimore. She refused to give this information, because her daughter did not want her husband to know her address. The appellee contends that Mrs. Dunham told the solicitor for the appellant that her daughter's address was her home in Binghamton. This she denies, and the testimony of Mr. Wickes certainly does not show that the mother-in-law told Mr. Proctor that her daughter's home was at her address in Binghamton. What happened was that the appellant went to Binghamton on a Christmas vacation, to see her people and her baby. While there Mrs. Dunham came to Baltimore County and instituted the nonsupport proceedings. The daughter stayed there two weeks and then returned to Baltimore.

Within two weeks after the nonsupport proceedings, the appellant filed his bill for divorce, alleging that his wife was a nonresident. Mr. Proctor's letter, dated January 10, 1946, addressed to Mrs. Alice Graham, 20 Park Terrace Drive, Binghamton, New York, was received by the mother of the appellant. It was referred to Mr. Emmons, their attorney, who advised her to wait until the Clerk of the Court sent a copy of the Order of Publication. This was not received because the Clerk mailed

444

the copy to Mrs. Alice Graham at 20 Park Terrace Drive, Binghamton, New York, and the postmaster returned the same to Mr. Spittel, the Clerk of the Court. On April 19, 1946, Mrs. Dunham wrote the Clerk of the Court for Baltimore County inquiring why the copy of the Order of Publication had not been sent to the appellant, in accordance with Mr. Proctor's letter of January 10, 1946. The Clerk replied that his letter had been returned by the postmaster because of wrong address. Mrs. Dunham did not tell the appellant about this until September, 1946, and she filed her petition in this case on December 2, 1946.

The appellant contends: (1) That the appellee is guilty of fraud, (2) that the chancellor was without jurisdiction to entertain the bill for divorce, and (3) that the appellant was surprised. If the record shows that any one of these three contentions is sustained, the appellant is entitled to relief. Fraud will vitate anything; if a court acts without jurisdiction its action is a nullity; and equity demands that a proceeding be reopened and a respondent be permitted to answer and defend, if taken by surprise. The law is settled in this State.

"As a general rule, it is true that a decree once enrolled cannot be opened, except by a bill of review, or by an original bill for fraud. To this rule, however, there are well founded exceptions, arising in cases not heard upon the merits, and in which it is alleged that the decree was entered by mistake or surprise, or under such circumstances as shall satisfy the court in the exercise of a sound discretion, that the enrolment ought to be discharged and the decree set aside. These exceptions are supported not only by the soundest reason, but by the highest authority. The decree in such cases being by default, and not upon the merits, the cause of the default can never be the subject of inquiry until the decree has been pronounced, and generally not until after the term has passed. Without the exercise, therefore, of this power in the court to vacate the enrolment, a party against whom a decree had been entered and enrolled by

mistake or surprise, and without any laches on his part, would be without redress, however meritorious his defense may have been. A bill of review would be of no avail, because his claim to relief is not based upon error apparent in the decree, nor on account of newly discovered evidence; and unable to charge fraud in obtaining the decree, he could not file an original bill to vacate it upon that ground. Accordingly, it is laid down by the most eminent elementary writers, and fully sustained by adjudged cases, that where a case has not been heard upon the merits, the courts will, upon good cause being shown, 'exercise a discretionary power of vacating an enrolment and giving the party an opportunity of having his case discussed.' " *Herbert v. Rowles,* 30 Md. 271, side page 278; *Gechter v. Gechter,* 51 Md. 187; *Foxwell v. Foxwell,* 118 Md. 471, 84 A. 552; *Foxwell v. Foxwell,* 122 Md. 263, 89 A. 494; *Simms v. Simms,* 178 Md. 350, 13 A. 2d 326; *Wyahllyeth v. Wyahllyeth,* 178 Md. 417, 13 A. 2d 551; *Bailey v. Bailey,* 181 Md. 385, 30 A. 2d 249; *Croyle v. Croyle,* 184 Md. 126, 40 A. 2d 374; *Hinden v. Hinden,* 184 Md. 575, 42 A. 2d 120.

In the testimony taken before the examiner the appellee testified that he last heard from his wife at "20 Park Terrace Drive, Binghamton, New York"; that when she left him she said "she was going back to her people in New York". Mrs. Belle Graham testified before the examiner that "she (appellant) said that she was going back to her people in New York" and "the last I heard about her (appellant) she was with her mother in Binghamton, New York". This is all the testimony adduced before the examiner that the appellant was a nonresident of the state of Maryland at the time of the institution of the bill of complaint in this case.

The testimony of the appellant before the chancellor flatly contradicts that she was a resident of New York at the time of the filing of the bill. Her testimony shows that she lived in Baltimore City, gives the names of the people from whom she rented, and the addresses where she stayed; gives exactly where she was employed and the

time of her employment. She swore that she was a resident of Maryland in August, 1945, and intended to make her home here and that she did in fact live in Baltimore City and was employed there continuously from August, 1945, until January 1, 1947. This testimony is corroborated by her mother, Mrs. Dunham. The appellant also testified that from the time of the separation, in April, 1944, until December, 1944, the appellee came to see her and had marital relations with her. This testimony is uncontradicted. Mr. Wickes, in his testimony, certainly does not say that Mrs. Dunham told him that her daughter, the appellant, was a resident of New York. The appellee could have checked this testimony without any difficulty. She gave the names of her landlords, the addresses, the time of her tenancy; she gave the names of her employers and the time of her employment, and one of her employers was a State agency. If appellee was surprised by this testimony, the chancellor, upon application, would have granted a continuance for the purpose of verifying the same. This the appellee did not do, and the inference is strong that he did not do it because the testimony of the appellant was true. He certainly could have denied, even without asking the court for a continuance, that he had marital relations with his wife between April, 1944, and December, 1944.

It is contended that Mr. Proctor's letter of January 10, 1946, was equivalent to an order of publication, which the appellant received, and that she should, therefore, have appeared in the case. But in that letter it was stated that the appellant would receive from the Clerk of the Court a copy of the order of publication. That letter was taken to an attorney who advised her to wait until she received the copy of the order of publication from the Clerk of the Circuit Court for Baltimore County. No communication from the Clerk was ever received by the appellant. The Clerk mailed it to her addressed to "20 Park Terrace Drive, Binghamton, New York" (the address of her mother was 20 Park Terrace Place, Binghamton, New York) and it was returned to the Clerk by

the postmaster for better address. While we do not think the evidence establishes fraud, yet it seems to be quite a coincidence that he should have last heard from his wife at 20 Park Terrace Drive, Binghamton, New York, as he testified before the examiner. The record shows that he had visited his mother-in-law's home at 20 Park Terrace Place, and there are a number of letters in the record, written by him, addressed to 20 Park Terrace Place, so he knew exactly what the address of his mother-in-law was. Mr. Proctor stated before the chancellor that this error in address was his error, and assumed the responsibility therefor, so that the inference is, that the appellee told Mr. Proctor the correct address of his mother-in-law. Not hearing from the Clerk of the Court, Mrs. Dunham wrote the Clerk and the Clerk then advised her that the decree in this case had been entered. She told their attorney about this and the appellant was not advised of the matter until September, 1946. It is also contended that this fact, together with the fact that appellant was in Baltimore during the time the divorce proceeding was pending, and did not come to the Clerk's Office at Towson to inquire about the matter, estops her from the relief prayed for in her amended petition.

We do not think it was unreasonable for the appellant to rely upon the advice of her counsel. The testimony taken before the examiner was entirely *ex parte*. Nothing has happened since the decree was passed, that affects the parties to this case. Neither has remarried. This case has never been heard on its merits, and a cross examination of the appellee and his mother might well elicit facts that would give the chancellor a broader view of the case. Both the appellant and her mother were cross examined at length before the chancellor by the solicitor for appellee. We think that the facts in this case do not justify us to hold that the appellant is estopped from asking for the relief she prays in her first amended petition. *Croyle v. Croyle, supra; Connelly v. Connelly,* 190 Md. 79, 57 A. 2d 276; *Simms v. Simms, supra.*

448

The evidence in this case leads us to conclude that the appellee's failure to give to the Clerk of the Court the proper address of his mother-in-law, in Binghamton, New York, which he knew, and the subsequent granting of a decree *pro confesso* because of the failure of the appellant to answer the bill as directed by the order of publication, and the granting of the final decree of divorce, was such surprise to the appellant as to entitle her to the relief for which she prayed.

Courts discharge an enrollment and strike out a decree if the evidence, in the sound discretion of the court, warrants such action, and such action "exists even more strongly in divorce proceedings than in other cases to which the rule is applied". *Foxwell v. Foxwell,* 122 Md. 263, 273, 89 A. 494; *Foxwell v. Foxwell,* 118 Md. 471, 84 A. 552; *Simms v. Simms, supra; Hinden v. Hinden, supra.* We think this case also falls under this rule.

The chancellor should have granted the first, second, third and fourth prayers of the appellant's first amended petition.

We call attention to the General Equity Rule 10A. It is applicable to all cases of divorce and annulment of marriage. It was passed by this court on April 4, 1944, and was applicable to this case. It provides, in part:

"In such cases, therefore, where only notice by publication has been given to the defendant, a final decree for the complainant shall not pass until a sworn statement by the complainant or his or her solicitor shall be filed which shall give a circumstantial account of the efforts of the complainant to locate the absent defendant and to warn him or her of the pendency of the suit, or until sworn evidence before the examiner shall disclose a *bona fide* effort by the complainant to discharge his or her obligation to notify the defendant. And the failure of the complainant to make such reasonable effort in good faith, and to offer proof thereof, shall be ground for the postponement or denial of the entry of decree *pro confesso* or of final relief."

Mr. Proctor made a statement before the examiner that he had mailed his letter of January 10, 1946, heretofore referred to. This was not proof, as Mr. Proctor was not sworn, and it cannot be considered. The husband testified that his wife, when last heard from, was living at 20 Park Terrace Drive, Binghamton, New York. He knew that was not the address of the mother of the appellant, with whom he thought she was then living, because he had visited there and mailed a number of letters to her home, all of which were addressed by him to 20 Park Terrace Place. Mr. Proctor admitted in open court that the mistake in this address given to the Clerk of the Court was his error. This indicates that appellee gave Mr. Proctor the correct address of Mrs. Dunham. The appellee testified before the examiner that Mrs. Dunham's address was 20 Park Terrace Drive. When the letter mailed by the Clerk of the Court, in which he inclosed a copy of the order of publication, was returned to him because of wrong address, nothing, apparently, was done to try to get the right address. Mr. Proctor knew that the Clerk's letter had been returned, for it was among the papers in the case. Apparently he did not take the matter up again with his client and if he had done so, it is quite probable his client would have given him the correct address of his mother-in-law. In that event Mr. Proctor could have instructed the Clerk to send the order of publication to the right address of the defendant's mother. Failure to do this cannot be regarded as a compliance with the rule. Rule 10A requires one to do all he can do to comply with its provisions. The testimony must show that there was a diligent and sincere effort to comply with its provisions. There was no such effort by the appellee in this case. The court should not have signed the final decree until this rule was complied with.

*Decretal order reversed, with costs to appellant; case remanded for proceedings in accordance with this opinion.*